Stephens and Condit Trans. Co. v. Tuckerman, Milligan & Co.

[Note.—The following case was decided at the March Term, but circumstances not within the control of the Reporter prevented its insertion among the cases of that term.]

## THE STEPHENS AND CONDIT TRANSPORTATION COMPANY v. TUCKERMAN, MILLIGAN & CO.

1. The defendants, whose general business was that of common carriers between Newark and New York, contracted to transport two hundred tons of pig iron from Newark to Saugerties, on the Hudson river, gave to the plaintiffs a bill of lading, setting forth that they had shipped, in good order and condition, the said iron on board the barge called the Charles Mayo, then lying at Newark, to be delivered to the plaintiffs or their assigns, at the port of Saugerties, in like order and condition, the dangers of the seas only excepted. *Held*, that if not otherwise liable as common carriers, they contracted such liability by the bill of lading, which bound them to deliver the iron in good order and condition as they had received it, the dangers of the sea only excepted.

2. The plaintiffs' claim for loss in case of non-delivery rests upon the bill of lading, and by that the defendants clearly contracted upon the basis of a common carrier's liability—as such they were insurers, and the burthen of proof was thrown upon them to bring themselves within the exception.

3. The definition of the expression, "dangers of the seas," as given by the Supreme Court, in this case, 3 *Vroom* 323, approved and adopted.

4. The defendants were bound to provide a seaworthy vessel. The contract was not for care and diligence. The fact of a previous examination of the vessel was competent as bearing upon the question of her condition, but could not, in this case, relieve the defendants, if she was, in fact, unseaworthy.

5. If the barge was improperly loaded, it will not discharge the defendants to show that she was loaded as barges usually are loaded—proof of such custom is evidence that for the safety of transportation such method of loading is a proper and safe method of stowing the loads—and the force of such evidence is not to be overcome, unless by clear proof that the loading was improper and unsafe. But proof of such custom will not conclude a jury from determining from all the evidence in the cause, whether the barge was, in point of fact, properly loaded.

This action was brought by Lucius Tuckerman and others, plaintiffs below, against the Stephens and Condit Transpor-

tation Company, for damages sustained by them, by reason of the non-delivery and loss of two hundred tons of pig iron, which the defendants contracted to deliver to the plaintiffs at Saugerties, New York.

The declaration charged in the first count, that at the time of the undertaking, &c., the defendants were, and had theretofore been, common carriers, by water, of goods and chattels for hire, from the city of Newark, in the county of Essex, and State of New Jersey, to the city of New York, and divers other places along the East river and Hudson river, in the State of New York, to wit, &c.; that being such carriers, the plaintiffs, on the 18th of November, 1865, at Newark, &c., at request of said defendants, caused to be delivered to them as being such carriers, at, &c., two hundred tons of No. 2 Glendon pig iron, of the said plaintiffs, of the value of one hundred dollars each ton, to be taken care of and safely and securely carried and conveyed by said defendants, as such carriers as aforesaid, from Newark, in, &c., to Saugerties, a place on the Hudson river, in, &c., and there, to wit, at, &c., to be safely and securely delivered by the said defendants to the said plaintiffs; and in consideration thereof, and of certain reward to the said defendants in that behalf, contracted by the said plaintiffs to be paid, they, the said defendants, being such carriers as aforesaid, then and there, to wit, on, &c., at, &c., undertook and then and there faithfully promised the said plaintiffs to take care of the said goods and chattels, and safely and securely carry the same from Newark to Saugerties, in, &c., and there, at, &c., safely and securely to deliver the same to the said plaintiffs; yet the said defendants, not regarding their duty as such carriers, nor their promise and undertaking as aforesaid, have not taken care of said goods and chattels, nor safely or securely carried or conveyed the same from Newark to Saugerties aforesaid, nor have thereat, &c., safely or securely delivered the same to the said plaintiffs; but so negligently and carelessly behaved and conducted themselves with respect to the said goods and chattels, that by and through the

said carelessness, negligence, and improper conduct and default of the said defendants and their servants, the said goods and chattels became and were, and still are, wholly lost to the said plaintiffs.

The second count charged that the defendants were common carriers, and had as such a vessel called the Charles Mayo, then in the river Passaic, and bound from thence to Saugerties; that the plaintiffs at, &c., at the request of defendants, shipped on board said vessel other two hundred tons of pig iron, and defendants undertook to deliver them safely and securely to the said plaintiffs, the dangers of the seas excepted, and alleges (as the first count) that the defendants did not securely deliver them, although no danger of the sea prevented them from so doing, &c.; but through mere carelessness and negligence of defendants and their servants were wholly lost, to wit, &c.

The third count sets forth simply, that in consideration that the defendants had the care and custody of divers other goods, &c., of the plaintiffs' they undertook and promised the plaintiffs to take due and proper care of them so long as they had the custody of the same, but for want of such care were wholly lost, &c.

To these several counts defendants pleaded the general issue.

The case was tried at the Essex Circuit, in January Term, 1867, and there was a verdict for the defendants, which was set aside by the Supreme Court, and a new trial ordered.

The new trial was had at the Term of January, 1868, at the same circuit, before Justice Depue and a jury.

The plaintiffs, in support of their case, offered David W. Weiss as a witness, and a bill of lading for two hundred tons of No. 2 Glendon pig iron, received by the defendants in good order and condition, and shipped on board the barge

called the Charles Mayo, lying at the port of Newark, and bound for Saugerties, New York, and to be delivered in like order and condition at the port of Saugerties, (the dangers of the seas only excepted) unto the plaintiffs or their assigns. The bill of lading was dated Newark, 18th of November, 1865, and signed by Miles McKeon, master of the barge for this voyage. The plaintiffs proved that the iron was never received ; and having rested their case, the defendants moved the court to non-suit the plaintiffs, which motion was denied, and a bill of exceptions taken.

On the part of the defence many witnesses were examined, and much testimony offered to show the nature of the contract between the parties, the circumstances under which the loss occurred, and that the defendants were under no legal liability to respond in damages for it.

The important parts of the evidence are referred to in the charge of the court.

After the evidence on both sides was closed, the counsel of defendants prayed the justice to charge the jury on the following points :

*First.*  That the defendants having proved that they do not ordinarily send vessels or transport goods to Saugerties, they were not bound as common carries to accept and carry goods destined for that place.

Thereupon the justice charged the jury that the said question was not material to the issue.

*Second.*  If they do accept such goods they are for that journey only private carriers, although they may be common carriers on other routes, and being private carriers are only liable for negligence, and the plaintiffs are bound to show such negligence to recover.

Thereupon the justice refused so to charge, and charged as set forth in the charge itself.

And the counsel for the defendants thereupon excepted to

such charging, and to such refusals to charge, respectively, and his exceptions are thereupon sealed accordingly.

DAVID A. DEPUE, *Judge.*

The court then charged the jury as follows:

On or about the 9th of November, 1865, the plaintiffs, who are manufacturers of iron, at Saugerties, in the State of New York, became the purchasers of two hundred tons of Glendon pig iron, of Tisdale & Co.

At the time of the purchase, the order was in bulk on storage with the defendants, on their dock in the city of Newark. The plaintiffs, desiring to have the iron shipped to Saugerties, opened a correspondence with Mr. Smalley, the superintendent of the defendants, with a view of obtaining a shipment of the iron to that point.

The correspondence ended in an arrangement by which the iron was to be shipped, at a freight of one dollar and fifty cents per ton, and one of the defendants' boats was detached from their usual and ordinary route for the purpose of transporting the iron to the place in question. The correspondence is a matter of no importance in the cause. The bill of lading, which was accepted by the plaintiffs, and is sued on, constitutes the sole contract between the parties.

At this time the defendants were common carriers, regularly engaged in the business of transporting goods and merchandise between Newark and the city of New York, and holding themselves out, however, as willing to engage, on special terms, for transportation elsewhere. The goods were shipped on the defendants' barge Mayo, which, on its way up the North river, was sunk, and the iron lost.

The Supreme Court held, in this very case, when it was before them, upon substantially the same evidence on this particular point, that the defendants were common carriers not only between Newark and New York, but that they were common carriers over the whole route of this employment from Newark to Saugerties, and that their liability to the plaintiffs to respond to them for the damages sustained

by the loss of this iron was to be determined with reference to the obligations which the law puts upon common carriers, engaged in the transportation of goods and merchandise, under a contract of shipment such as exists in this case.

By law, common carriers are held to the strictest kind of accountability. They are absolute insurers of the safety of all property entrusted to them for the purpose of transportation, and can only discharge themselves from that liability by showing that the loss was occasioned by the act of God or public enemies.

The reason given for the strictness of this rule is that the owner parts with the custody of his property, and puts it in the care and under the control of the carrier, and considerations of public policy require that he should be held as an insurer of its safety—to be discharged from liability to respond for its value in case of loss, only by showing that the loss was occasioned by the act of God or of the public enemies.

This rule of law which I have stated is well settled, and has received the sanction of our courts, not only in this case, but also in an earlier case, decided by the unanimous opinion of our Court of Errors—the highest court of the State of New Jersey. It is, therefore, the well-settled law of this state.

For a long time in judicial history the courts denied the power of common carriers to limit, qualify or abridge their common law liability, as insurers, by express contract, but gradually this principle has been relaxed until the law is now settled; that while common carriers are still bound, by virtue of their general business, to accept all goods offered to them to be transported over their route, subject to their common law liability, yet if the shipper consents that the goods shall be received upon an express contract, by which that common law liability is modified, the carrier is held only to the terms of that express contract, *provided* that such contract does not amount to an agreement, to exempt the carrier from the consequences of his own negligence.

But such express contract, when made, is not considered as an entire substitution for the common law liability of a carrier, but rather as an exception, taking the case thereout. And the courts give to such exceptions the strictest construction, and put upon the carrier the burthen of proving affirmatively that the loss was occasioned by some one of the causes that the parties stipulated that the carrier should not be responsible for. There is such an express contract in this case—that contained in the bill of lading—and by that contract the rights and liabilities of the parties in this case are to be determined. That bill of lading contains an acknowledgment of the receipt of this iron, and an agreement by the defendants to deliver it at Saugerties in like order and condition, the dangers of the seas only excepted.

By this contract the defendants became absolute insurers of this property against all losses except such as were caused by the dangers of the seas; and the burthen of proof rests upon the defendants to satisfy you affirmatively that the loss in question was occasioned solely by the dangers of the seas, and if they have failed to do so, as *otherwise* insurers, they must respond to the plaintiffs for the value of the goods lost.

The burthen of proof lies in this wise: By proof of the delivery of the iron to the defendants, and its non-delivery at Saugerties, the plaintiffs have made out a *prima facie* case against the defendants, from which the defendants can only escape by showing that the goods were lost in the course of transportation, and that such loss was occasioned by the dangers of the seas; and you must be satisfied as the result of the evidence, that the loss was due not only proximately to the dangers of the seas, but that it was not contributed to by any negligence or default of the defendants, either in the unseaworthiness of the vessel to engage in such a voyage, even if that defect be latent, or in the improper or unsafe loading of the vessel, or in putting to sea in a storm, by which navigation was rendered perilous, or by negligence, default or mismanagement by the hands on the

barge, at the time of its loss, which contributed to the occurrence.

The question of absence of negligence does not form the groundwork of this defence. A common carrier, receiving goods under a special contract, may be answerable for them, although no actual blame is imputable to him. The efficacy of the defence consists in showing that the loss was occasioned by *that* cause, which by the stipulation of the parties was agreed. upon, as *the* excuse for the non-delivery of the goods.

If the accident, which occasioned the loss in question, was not within the exception in the bill of lading, and yet happened *wholly* without any fault on the part of the carriers, it is their misfortune and not the misfortune of the shipper, and the carriers are nevertheless liable.

I desire to be correctly understood on this point, as jurors frequently misapprehend the precise point in a defence of this character, and are misled into considering that the question of negligence or no negligence, is only involved in this defence. I therefore repeat what I have already said, that the efficacy of this defence consists in proof that the loss was occasioned by the dangers of the seas; as to loss happening from any other cause, the defendants are insurers, and liable therefor, even if entirely free from blame.

The question of negligence only becomes an element in the cause, when, after the defendants have proved that the storm in which the vessel went down, was one of overwhelming power, it is introduced by the plaintiffs to deprive the defendants of the benefit of that defence, by showing that the loss was not occasioned solely by that cause, but was contributed to by the want of ordinary skill and prudence on the part of the defendants.

You will perceive by these principles of law that I have stated that the meaning of the phrase "dangers of the seas" is of great importance in this case. That expression has a legal signification, somewhat different from what might ordinarily be inferred from the primary meaning of the words;

and as we are sitting in a court of law, construing a legal instrument, to ascertain what the legal rights of the parties are, we must give to these words their legal signification.

The Supreme Court has defined the expression " the dangers of the seas," to mean those accidents peculiar to navigation, that are of an extraordinary nature, or arise from irresistible force or overwhelming power, which cannot be guarded against by the ordinary exertions of human skill and prudence.

The expression is somewhat wider in its scope than the expression, act of God. It includes loss occasioned by hidden obstructions to navigation recently placed there—collision without fault of either party, and some few other cases not covered by the phrase, act of God. But where the insistment is, as it is in this case, that the loss was occasioned by the force of the elements, the phrase, dangers of the seas, is entirely synonymous in its meaning with the act of God, and was so considered in the Supreme Court in the opinion which was read in your hearing.

Adopting, then, the language of this definition, was the storm in which this vessel was sunk a storm of irresistible force or overwhelming power? This is a question of fact for your consideration, and a few general observations upon the evidence, to aid you in applying it to the issues in the cause, is all that is necessary.

The barge was not capsized by a sudden squall, which spent its fury upon this vessel alone. The storm in which she perished was one of considerable extent. Other vessels in the immediate vicinity and elsewhere were subjected to the same stress of weather. The place where she sunk was not, at ordinary times, unusually dangerous to navigation ; and in a storm, the only peculiar dangers were due to the width of the bay, allowing the wind to sweep across it.

Much evidence has been given by witnesses who describe the storm as extraordinary or otherwise. Evidence of that character was competent to be received. But as expressions of that kind are merely the opinions of the witnesses, or their

own inference from facts within their observation, their weight and importance must depend upon the extent to which they are justified by the facts proved in the cause.

It is your province and your duty to determine as a question of fact, whether this storm was an extraordinary storm, of irresistible force and overwhelming power, and the opinions of witnesses contained in words of description are entitled to consideration, according as they are justified or not justified, when encountered by the *facts* proved in the cause.

To illustrate : if a man should describe a storm as of unwonted fury, bursting upon this city, and it should appear that after it subsided little or no damage was sustained by property exposed to it, the force of such description would be greatly impaired.

So in this case, you are to subject these descriptions to the test of the facts proved, and results which were occasioned thereby. Such a test you have in this case in the conduct of the persons on this barge and on other vessels in this tow, and in the refusal of others to put out in this storm, and in its effects on other vessels subjected thereto.

On the part of the defendants it is insisted that the description of these witnesses of the storm is not only justified by the facts proved in the case, such as its effects upon other vessels and the refusal of other experienced watermen to put out because of the storm, but that those facts raise the degree of the violence of the storm to that of one of irresistible force and overwhelming power.

On the other hand, it is argued that the fact that the captain turned in from two to three hours before the vessel sunk —that the two hands who were left on watch, as soon as they were put on watch, pumped the barge out, and found that the water in her readily yielded to the pumps; that they did not again try the pumps until she was in a sinking condition, and that they, who of all others, should have observed the condition of the weather, and the perils to which the vessel in their care was exposed, have not testified to any extraordinary occurrence ; that of the twenty-five vessels

Stephens and Condit Trans. Co. v. Tuckerman, Milligan & Co.

in this tow, only this barge and the Arrow, which was cut adrift when the Mayo sunk, met with disaster; and that of all the other shipping afloat on that night, at most only one other vessel was sunk or driven ashore. These facts, plaintiffs' counsel insists, show that this storm was not such as is necessary to the defendants' defence.

These facts are entitled to great consideration at your hands, and I have no doubt you will give them the importance they deserve, keeping steadily in view that the subject matter of inquiry is not whether this was an unusual storm, but whether it was a storm of irresistible force and overwhelming power.

If, after an examination of this part of the case, you are not satisfied that the storm was a storm of irresistible force and overwhelming power, the defence has failed, and you need not enter upon the consideration of the other part of the case, but should proceed at once to assess the plaintiffs' damages.

But if it has been made to appear to you satisfactorily, by the evidence of the defendants, that this storm was one of irresistible force and overwhelming power, such as made navigation unusually perilous, the defence is complete, unless the plaintiffs break the line of that defence, by showing default or negligence on the part of the defendants, which contributed to the disaster to the vessel, because by proof of such default or negligence, contributory to the loss, the excuse of the carrier fails, because the act of God, to relieve the carrier, is necessarily exclusive of all human agency.

But the defendants, when they have shown that the storm was one of overwhelming force, are only bound for the exercise of ordinary skill and prudence in their efforts to avoid the disaster, and are only to be considered negligent when it appears that they did not exercise ordinary care and skill.

The plaintiffs have endeavored to introduce that element in the case. They deny, first, that the storm was one of irresistible force or overwhelming power; and, in the second place, their insistment is, that if the storm was of such vio-

lence that it was of overwhelming power, yet that the defendants were themselves negligent or in default, and that, therefore, they are not within the protection of the exception of the bill of lading.

This insistment, if relied on, must be proved by the plaintiffs. The burthen in that respect lies upon them. But if proved, it will destroy the defendants' defence, even if they have satisfied you that the storm was one of irresistible force or overwhelming power.

The insistment is, that the defendants were in such default in several particulars. If they succeed in establishing *any one* of these particulars, and that the accident was contributed to by reason thereof, the defendants' proper defence is overcome, and the plaintiffs, for *that* reason, will be entitled to a recovery.

They insist—

1. That the vessel was not suitable for the voyage, or was not seaworthy. By seaworthiness, as applicable to this case, is meant that the vessel, in construction and build, and in condition and repair, should be *reasonably fit* to engage in that voyage, with *that* load, at *that* season of the year, and sufficiently staunch to withstand the ordinary action of the winds and the waves, which it was expected would be encountered.

That a vessel of stauncher build or of a different class, would have successfully encountered these perils, is not of itself evidence that this vessel was not suitable for this voyage, if it appears that craft of this construction and build were ordinarily and usually employed in this kind of transportation.

Nor will it be presumed from the fact of loss, standing alone, that the vessel was unseaworthy.

But where it appears that a vessel starts a plank when in a tow of twenty-five boats, among which were vessels of the same description and build, or of a build less suited to encounter the ordinary perils of navigation, that circumstance

affords a presumption that she was unseaworthy, unless another adequate cause for the starting of the plank is shown.

Again: while on this subject of seaworthiness, it is proper that I should call your attention to the extent to which the defendants are accountable for any defects which make the vessel unseaworthy.

The carrier guarantees that his vessel was, in point of fact, seaworthy. If, in point of fact, it was not seaworthy, he is liable. If the defect was a latent defect, and unknown to him, he nevertheless must answer for damages occasioned by such defect.

The evidence is that this barge was built in 1842; that from time to time she was overhauled, examined and put in order; that when she was raised after she was sunk, it was found that two planks on her side had been sprung.

It further appears in evidence that the last time she was overhauled was fourteen months before this disaster. It is testified to, that she was then carefully examined. It does not, hovever, appear that any of her planks were then renewed.

If you believe, from the evidence, that the springing of these planks was the cause of the sinking of the barge, and that by reason of the condition of these planks, or their fastenings, the barge was not seaworthy, the defendants will not be discharged, because of their having had the barge examined, and that such defects were not discovered.

They had contracted that the vessel was seaworthy, and they are bound by that contract. Nothing short of its complete performance will discharge them.

In the second place, it is said that this barge was not sufficiently equipped with pumps. If you are satisfied by the evidence that she was not furnished with the usual complement of pumps, the owners were in fault; but the owners were not bound to procure more pumps than usually constitute the proper equipment of a vessel of this class engaged upon such a voyage.

In the third place, it is insisted that the vessel was not

properly loaded.   That an insufficient quantity of the iron was put in the hold ; that too much of the load was on deck ; and that by reason of such proportion of the iron being on deck, and the placing of hay on the deck, and the inclosing of it with a tarpaulin, between the lower deck and the hurricane deck, the barge was made top-heavy.   And that this mode of loading, by reason of the peculiar construction of the barge, made her unable to withstand a storm which otherwise would not have sunk her.

Whether such defects in loading, or in the building of the barge existed, is a question for you to determine from the evidence in the case, applying to it the rule of law, that the load of the vessel must be stowed in such manner as to provide for their safety in the course of transportation.

If you find, from the evidence, that the barge was improperly loaded for its safety in transportation, and that the sinking of the barge was contributed to thereby, the defendants cannot discharge themselves, by proof that this barge was loaded as barges are usually loaded.

For all other causes, as I have already stated, except dangers of the seas, the carrier is liable.   If unsafely or improperly loaded the carrier was in default.   For that default, the carrier is responsible by well settled rules of law.   And the defendants cannot, by proving that the barge was loaded as barges usually are, discharge themselves from liabilities put upon them by law.

Proof of a custom to load barges chiefly on deck is entitled to this effect, that its general adoption by persons engaged in the carrying business, is evidence that for the safety of transportation such method of loading is a proper and safe method of stowing the loads, and the force of such evidence is not to be overcome unless by clear proof that the loading was improper and unsafe.

But proof of such custom will not conclude you from determining from all the evidence in the cause, whether in fact the barge was properly loaded.

In considering this question, a vessel is to be considered

as properly loaded when her load is so stowed as to insure a safe transportation, and not with a view to recover the load in case the vessel is sunk. As was well said by counsel, the carrier is bound to load so as to secure a safe voyage, and not a recovery after a loss.

In the fourth place, it is insisted by the plaintiffs that defendants were guilty of negligence in starting out in the midst of a storm.

If that be so, and the storm, when they left New York, was such as to make navigation perilous, or that appearances betokened a storm, so that a prudent man would not have ventured out, under those circumstances it was negligent in the captain to venture out.

But it ought to appear, clearly, that the condition or appearance of the weather was such as to have deterred a prudent man venturing out.

*Fifth.* It is further insisted that there was negligence in the captain of the tow in not making a harbor with his whole tow, or in not putting this barge in harbor.

You have heard the evidence as to possibility of making a safe harbor at that part of the river with the tow, or of putting this barge in a safe place.

I need not repeat the evidence on this subject. It is only necessary for me to say that if the captain, in the exercise of a sound discretion, knowing the difficulty of making a landing and the danger of dropping the barge from the tow, in good faith pursued the course he judged best for the safety of the whole tow, he is in no default because he might have ventured to make a landing, which probably might have insured the safety of this barge.

It was also insisted that there was negligence or want of ordinary care by the hands employed on the barge at the time of this accident, and that by the exercise of diligence, after it was discovered that the barge was sinking, a portion, at least, of the plaintiffs' iron might have been saved.

As to the first branch of this insistment, it is undoubtedly the duty of the carrier to have a sufficient complement of

skillful hands on board, all the while, to guard against the possibility of accidents.

It appears, from the evidence, that the barge had on all the usual complement of hands; that the watch was changed at the usual hour, and that the watch was made up according to the usual custom.

If, when the captain turned in, he had no reason to expect unusual dangers, he was justified in adopting merely such precautions, as to watch, as ordinarily are considered sufficient to guard against accidents. But if the vessel was laboring in a storm and these hands neglected to try the pumps, as they were directed, as frequently as was necessary to enable them constantly to know the condition of the water in the hold, they were guilty of neglect; and if such neglect contributed to produce the result, the defendants cannot shelter themselves behind the exception in the bill of lading, for the result, in that case, was not caused solely by the violence of the elements.

As to the second branch of this insistment, that there was neglect to remove the goods after the vessel was in a sinking condition; the carrier, when the vessel is sunk by dangers of the seas, is not bound to recover the goods, but he is bound, even in such case, to the exercise of ordinary skill and prudence to prevent the loss of the goods. You will remember the short interval that elapsed between the discovery of the condition of the barge and her sinking. The first duty of the captain was to ascertain what was the matter with the vessel, and to endeavor to keep her up if he could. The captain appears to have done that, and it does not appear that after he finished his examination of the barge it was within his power to have removed any considerable part of the cargo.

It is said that the plaintiffs should have insured the iron. They might have done so, and if they had the insurance would not have benefited the defendants, and their failure to insure is no discharge of the defendants. The question of insurance is entirely immaterial in this case.

Stephens and Condit Trans. Co. v. Tuckerman, Milligan & Co.

I have now gone over the whole of this case, and stated the different issues raised by the evidence in the case, and the rules of law applicable to each.

One question remains to be considered—that is the question of damages. It appears, from the evidence, that a portion of the iron was saved and a portion was subsequently recovered. For that the defendants are answerable. Whether the plaintiffs shall be allowed to recover for the residue, will depend on your finding of the issues in the cause. For whatever portion they are allowed to recover, its value should be assessed at fifty-five dollars per ton, with interest from the 21st of February, 1865, until the 27th day of February next, when judgment will be entered on your verdict.

And thereupon defendants' counsel requested the justice to charge the jury that it was not necessary for the defendants to prove a storm of such violence that no vessel could withstand its effects, but that it was only necessary to prove a storm of such violence as would be sufficient to cause the destruction of a vessel reasonably fit for the voyage, and thereupon the said justice did so charge.

Whereupon counsel for the defendants excepted to so much of said charge as stated—

I. And to so much thereof as charges the jury that the defendants were common carriers on the whole route of this employment, from Newark to Saugerties.

II. And to so much thereof as relates to the burthen of proof.

III. And to so much thereof as charges the jury that by this contract the defendants became absolute insurers against all losses, except such as were caused by the dangers of the seas, and that they must prove affirmatively that such loss was occasioned solely by the " dangers of the seas," otherwise, being insurers, they are responsible for the loss.

IV. And to so much thereof as charges the jury that unless the loss falls within the exception named in the bill of lading, the defendants are liable, even if wholly without fault.

V. And to so much thereof as charges the jury that the springing of a plank, under the circumstances stated in the charge, raises a presumption of unseaworthiness.

VI. And to so much thereof as charges the jury that if the barge, by reason of the condition of her planks or their fastenings, was unseaworthy and sunk, proof of care in overhauling and examining her will not excuse.

VIII. And to so much thereof as charges the jury that if the lading of the barge contributed to the loss, defendants cannot discharge themselves by proof that the barge was loaded as barges usually are, and as to the effect of proof of custom.

And thereupon the defendants' counsel excepted to the charge of the justice upon the several points thereof above stated, and their exceptions are hereby sealed accordingly.

DAVID A. DEPUE, *Justice Sup. Court.*

The jury rendered a verdict for the plaintiffs for the value of the iron, for which judgment was entered in the Supreme Court.

And thereupon the said defendants sued out a writ of error to remove the said judgment into this court, and assigned the following errors as grounds of reversal:

1. That the said justice refused, after the plaintiff had first rested his case, to grant the defendants' motion to non-suit the plaintiffs, and thereby erred.

2. That the said justice erred in so much of said charge as stated that the correspondence between the parties which led to the bill of lading was a matter of no importance.

3. That the said justice erred in charging that the defendants were common carriers along the whole route of this employment.

4. That the said justice erred in charging that the defendants, by this contract, became absolute insurers against all losses, except such as were caused by the " dangers of the seas."

Stephens and Condit Trans. Co. v. Tuckerman, Milligan & Co.

5. That the said justice erred in all of said charges relating to the burthen of proof.

6. That the said justice erred in charging the jury that when deciding upon the severity of the storm in question, the true test was, "was it a storm of irresistible force and overwhelming power?"

7. That the said justice erred in charging that the springing of a plank, under the circumstances, raised a presumption of unseaworthiness.

8. That the said justice erred in charging that proof of care in examining and overhauling the barge will not excuse if she sank by reason of the condition of her planks or their fastenings.

9. That the said justice erred in charging that neither proof of custom nor usage will excuse if the loading of the barge contributed to the loss.

10. And also, that there is manifest error in this, that the declaration aforesaid, and the matters therein contained, are not sufficient in law for the said Lucius Tuckerman et al., the plaintiffs, to have or maintain their aforesaid action thereof against the said defendants.

N. PERRY, JR.,<br>
<em>Attorney for plaintiffs in error.</em>

The case was argued by

*N. Perry, Jr.*, and *T. N. McCarter*, for plaintiffs in error.

*H. Young* and *C. Parker*, for defendants.

The opinion of the court was pronounced by

BEDLE, J.   The plaintiffs below were owners of two hundred tons of Glendon pig iron, lying at the dock of the defendants in Newark, and which they had bought while lying there, of other parties.   The plaintiffs were manufacturers of iron at Saugerties, in New York state, and on the 8th day of November, 1865, wrote to the defendants to engage vessels and ship this iron to the plaintiffs' iron works, at Sau-

gerties, and also stating that they presumed the freight could be engaged at about one dollar per ton. No answer having been received, the plaintiffs again wrote to the defendants November 13th, 1865, inquiring whether it was being shipped. To this the defendants telegraphed that they could not get iron freight to Saugerties for less than one dollar and fifty cents per ton, and asking if they should give it. The plaintiffs thereupon replied, "Pay $1.50 freight to Saugerties." This must have been about the 13th of November. Five or six days afterwards, the plaintiffs received a bill of landing from the defendants, dated November 18th, 1865, by which it appeared that the iron had been shipped by the defendants on their own barge, the Charles Mayo, and in which bill of lading the defendants acknowledged that the iron had been so shipped, "in good order and condition," and that the same was "to be delivered in like order and condition at the port of Saugerties (the dangers of the seas only excepted,) unto Tuckerman, Milligan & Co., or their assigns, he or they paying freight for the said pig iron one dollar and fifty cents per ton of twenty-two hundred and forty pounds, without primage or average accustomed." The defendants at this time were running a line of steamboats and barges between New York and Newark; that was their regular line, but they would occasionally take goods for transportation other than on the usual line, as in this case. The superintendent testifies that not finding one vessel that would take the whole, he concluded to ship it on the company's own barge. The barge loaded with the iron, was towed from Newark to New York, and reached there safely. The next day afternoon, about six o'clock, she left New York in a tow of twenty odd vessels, propelled by a steamboat, for Saugerties. On the way up Hudson river, the vessel sank abreast of Upper Nyack, during a storm, at two or three o'clock in the night. It had sprung a leak, and after beginning to sink was cut loose to save the other boats. Afterwards when raised, it was discovered that two planks on the bilge of the boat were sprung. The iron had been loaded mostly

on deck, and none was saved except a few tons that had been put in the hold, and a small quantity that had been transferred to one of the other vessels before the Mayo sank. None of the iron had been delivered to the plaintiffs, and this suit was brought to recover damages for the non-delivery. The verdict was for the value of the iron. The judge at the circuit treated the defendants as bound by the obligations of a common carrier (the dangers of the seas only excepted,) and the case was submitted to the jury on the ground that they were common carriers. He evidently held them to that liability upon the strength of the contract—the bill of lading—and charged that, " by this contract, the defendants became absolute insurers of this property against all losses except such as were caused by the dangers of the seas; and the burthen of proof rests upon the defendants to satisfy you affirmatively that the loss in question was occasioned solely by the dangers of the seas, and if they have failed to do so, as otherwise insurers, they must respond to the plaintiffs for the value of the goods lost;" and also, that " the burthen of proof lies in this wise : by proof of the delivery of the iron to the defendants, and its non-delivery at Saugerties, the plaintiffs have made out a *prima facie* case against the defendants, from which they can only escape by showing that the goods were lost in the course of transportation by the dangers of the seas." Several bills of exceptions were taken bearing upon the character of the defendants' liability, but all may be disposed of by a determination of the question whether the defendants were, in this transaction, subject to the liability of common carriers, excepting only dangers of the seas. There was no dispute that the defendants were, in fact, common carriers between Newark and New York; but much of the discussion of counsel was, whether they were to be considered as common carriers to Saugerties, from the nature and circumstances of their business, and liable as such on the receipt of the iron for this trip from Newark to Saugerties. The solution of that difficulty is not necessary in this case, for the defendants had a

right to assume and contract upon the liability of common carriers, whether, apart from the bill of lading, they were such or not. They contracted that liability by the bill of lading. That paper was an agreement which, after stating that the iron was shipped in good order and condition, bound the defendants to deliver the same in *like order and condition*, the dangers of the seas *only* excepted. There is a recent case on that subject, *Hay* v. *Wheeler*, in the Exchequer Chamber, (*Law Rep., C. P., vol. II,* 302.) By this contract the defendants put themselves in the situation of a common carrier. *Robinson* v. *Dinsmore*, 2 *Bos. & Pul.* 416.

It makes no difference whether that liability arises from the mere relation of the parties, depending only on the nature and character of the business, or whether that relation is the result of express contract. Neither is it necessary that the contract should, in terms, mention that the defendants are common carriers. The court may judge of the character of their liability from the contract itself. The express mention of the exception, " dangers of the seas only excepted," excludes the conclusion of any less liability than the absolute delivery of the iron in the condition stipulated, subject to that exception only, and the nature of the article being such as to exclude all question of loss by inherent tendency to decay. The whole scope and form of the bill of lading are also the same as are usually adopted by common carriers, and the exception, dangers of the seas, being only an enlargement in some respects upon the common law phrase, the act of God, but so far as the facts of this cause are concerned is synonymous with it, and it was so regarded by the Supreme Court. The plaintiff's claim rests upon the bill of lading, and by that the defendants clearly contracted upon the basis of a common carrier's liability. As such they were insurers of the iron, as charged by the judge, and the burthen of proof, according to the well settled rules of common carriers, was upon them to bring themselves within the exception.

The next error assigned is to the charge, " that where it

## JUNE TERM, 1869. 565

Stephens and Condit Trans. Co. v. Tuckerman, Milligan & Co.

appears that a vessel starts a plank when in a tow of twenty-five boats, among which were vessels of the same description and build, or of a build less suited to encounter the ordinary perils of navigation, that circumstance affords a presumption that she was unseaworthy, unless another adequate cause for the starting of the plank is shown." The defendants had endeavored to show that the vessel was lost by the overwhelming nature of the storm and that the loss could not have been avoided by the ordinary efforts of care and skill. The court defined the expression, dangers of the seas, to mean "those accidents peculiar to navigation that are of an extraordinary character, or arise from irresistible force or overwhelming power, which cannot be guarded against by the ordinary exertions of human skill and prudence." That was the definition approved of by the Supreme Court in this case, (3 *Vroom* 323) and it is correct. *Angell on Carriers*, § 167. The plaintiffs disputed that the storm was of such irresistible power, and alleged that if so, the defendants were negligent, and that the vessel was unseaworthy. On that question that part of the charge was made. It is only necessary now to say that from the facts as shown by the defendants, the presumption, which is merely one of fact, was fair and proper. Besides, it was merely the expression of an opinion upon the weight of a fact on which no error can be assigned.

The next assignment of error is to the charge, "that if you believe from the evidence, that the springing of these planks was the cause of the sinking of the barge, and that by reason of the condition of these planks or their fastenings, the barge was not seaworthy, the defendants will not be discharged because of their having had the barge examined, and that such defects were not discovered." The last time this vessel was examined and overhauled, was about fourteen months before the disaster. The defendants were bound to provide a seaworthy vessel. The contract was not for care and deligence. The fact of examination of the vessel was competent as bearing upon the question of

her condition, but could not, in this case, relieve the defendants, if the jury believed, from the evidence, that she was, in fact, unseaworthy.

The remaining error alleged is to the charge, " that if you find from the evidence that the barge was improperly loaded for its safety in transportation, and that the sinking of the barge was contributed to thereby, the defendants cannot discharge themselves by proof that this barge was loaded as barges usually are loaded." In the same connection it was charged that proof of such custom "is evidence that for the safety of transportation, such method of loading is a proper and safe method of stowing the loads, and the force of such evidence is not to be overcome, unless by clear proof that the loading was improper and unsafe, but proof of such custom will not conclude you from determining from all the evidence in the cause, whether in fact the barge was properly loaded." This part of the charge was as favorable to the defendants as the law will permit. The iron was mostly stowed on deck in tiers, about twenty tons only being in the hold, and over the top of the iron on deck were *tiered* about thirteen tons of salt hay. The jury had a right to judge for themselves whether the vessel was properly loaded to secure a safe voyage, and the custom to load in that way could not be claimed to conclusively show that the vessel was properly loaded.

The judgment of the Supreme Court must be affirmed.

*For affirmance*—The CHANCELLOR, CHIEF JUSTICE, BEDLE, DALRIMPLE, VAN SYCKEL, WOODHULL, CLEMENT, KENNEDY, OGDEN, OLDEN, VAIL, WALES.    12.

*For reversal*—None.

# CORRECTION.

THE WATER COMMISSIONERS OF JERSEY CITY v. JOHN L. BROWN.

It appearing to the court that, upon the minutes, Beasley, Chief Justice, is stated to have voted for affirmance in this case; whereas, in truth, said Chief Justice voted for the reversal of the judgment:

It is hereby ordered, that said minutes be corrected in accordance with the truth as above stated.

By order of

THE COURT.

A true copy from the minutes.

H. N. CONGAR, *Clerk.*

NOTE.—The case above referred to will be found in Vol. 3 of these reports, page 504–512.